UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

ANITA BENOIT                        CIVIL ACTION NO. 07-1109

VERSUS                              U.S. DISTRICT JUDGE DEE D. DRELL

WESTPORT INSURANCE,
    ET AL                          U.S. MAGISTRATE JUDGE JAMES D. KIRK


**RULING**

Before the court are motions in limine filed by plaintiff,
Benoit, doc. #39, and by defendant, Westport, doc. #38, referred
to me by the district judge for disposition.

Benoit's motion, #39.

Plaintiff seeks to exclude the testimony of defendant's
accident reconstruction expert, Dean Tekell. The motion is based
on the fact that Tekell's opinions are based on hypothetical
assumptions, and were created using an "Auto-CAD" computer
program with "Auto-turn" software. Plaintiff also argues that
Tekell is not qualified to offer an opinion as to what "cues"
plaintiff should have seen since he is not an expert in human
factors analysis. Defendant argues that it intends to use
Tekell's testimony of his opinions based on the software only for
the purpose of showing that the accident could not have happened
as plaintiff claims, a fact its counsel claims the district judge
already decided in ruling on the summary judgment motion

earlier[1].

This automobile accident occurred on Overton street in Alexandria on October 9, 2006. Defendant, Mr. Travelpiece was driving an oversize 18 wheeler Freightliner on the two-same-direction-lane street when his vehicle collided with plaintiff's vehicle in her lane of travel. Plaintiff's front passenger side collided with the front driver side of the 18 wheeler. Plaintiff claims Travelpiece was in the right-hand (outside) lane and she was in the left-hand (inside) lane, both traveling side by side at an "appropriate speed" when he turned left across her lane, causing the accident. Travelpiece claims that he had been stopped at the light in the left (inside) lane, and when the light turned green he steered into the right lane in order to have room for the necessary turning radius he would require, and plaintiff attempted to hurry past him in her (left) lane. He said that at the time of the accident, his tractor was in the right lane and his trailer was in the left lane.

The hearing showed that Mr. Tekell is an experienced, qualified accident reconstruction expert who has been accepted as an expert in many courts. Plaintiff does not suggest otherwise. Instead plaintiff objects to the factual basis for his testimony and his use of a computer program to generate his opinions.

Mr. Tekell testified that he reviewed the accident report

---

[1] The district judge's Ruling, doc. # 32, does not suggest such a view. No ruling has been made by the district judge at this point that the accident could not have occurred as plaintiff claims.

and visited the scene of the accident, observed traffic there and made measurements. The point of impact is unknown and there were no skid marks. Further, the investigating police officer did not favor the parties with a sketch or diagram of where the accident occurred. Tekell said he did not have the deposition testimony of the truck driver, Mr. Travelpiece, when he rendered his report but did have his affidavit. He had the deposition of plaintiff.

Tekell's report shows he concluded that it was necessary for the 18 wheeler to move into the right-hand lane in order to traverse the intersection and that Benoit should have noticed that. He further concludes that, accepting Benoit's version of the accident, then she should have seen the truck slowing before the turn.

At the hearing on this motion, Tekell testified that if Benoit's testimony were true, she would have already passed by the truck before it turned into her lane. On the other hand, accepting Travelpiece's version, then plaintiff would have to have been far behind the truck when he began from a standstill at the light and began moving into the right hand lane.

Mr. Tekell's testimony at the hearing showed that, although he considered four scenarios using Auto-turn software, only one is relevant, based on Travelpiece's version of events. He testified that using Benoit's version of events the Auto-turn software is not helpful because it is simply a matter of physics [time-distance analysis] to conclude that if the plaintiff

continues traveling at the same speed and the truck slows down the amount necessary to make the turn plaintiff would have been past the point of the accident before it could have occurred.

Tekell explained that the Auto-turn software allows him to key in the roadway and the vehicles. In this case, he uploaded an aerial photograph of the roadway. He utilized the "standard" 18 wheeler, 53 feet long total, pursuant to a default option in the program. Yet the testimony made clear that the 18 wheeler involved was not a standard 18 wheeler, but was one much larger in which just the trailer, excluding the tractor, was 53 feet long. Tekell admitted that that would change all the calculations and his conclusions. He also admitted that there exist an almost infinite number of paths the 18 wheeler could have taken within the driveable part of the roadway as it made its turn. He assumed a location where the wheels on the trailer were attached to the trailer, which location would change the turning radius and thus his calculations.

Tekell also assumed a point of impact because it is not known where in the intersection the accident occurred. He assumed the acceleration rate of the 18 wheeler, based on its being loaded. It was not. He admitted he did not know exactly where in the roadway, vis a vis the middle line, the tractor was as it turned. He assumed the time it took for the truck to make the maneuver.

Using Benoit's version of events, Tekell assumed that Benoit

didn't brake and the rate at which Travelpiece did brake for the turn. Then, based on a guess as to the location of the impact, assumes plaintiff's speed and opines as to where she was when Travelpiece braked.

These are a lot of assumptions and there are very few facts. As mentioned, the primary fact is unknown–where was the point of impact? Therefore, Tekell's testimony becomes little more than speculation.

That testimony becomes even more suspect when we consider that the assumptions were plugged into a computer program which then produced the results. While Mr. Tekell testified that the computer program allows faster calculations and does away with the need for a "template" as was required in the "old days", the problem is that we don't know what is programmed into the software. We don't know what assumptions it may be making or what choices or "decisions" it is programmed to make. Therefore the assumptions become even less reliable, yet the result is a bright, attractive computer presentation. That could easily mislead and unfairly influence the jury. Tekell admits that the software is not designed for use in accident reconstruction but rather is designed to aid traffic engineers in designing roadways and intersections and is the industry standard for those purposes. My research has not located any reported cases dealing with the admissibility of testimony generated by the software nor have the attorneys found such cases.

I conclude that Mr. Tekell's testimony should be excluded for two reasons. First, as to the software, it has not been shown that the methodology is appropriate for this case. The software is not regularly used by accident reconstruction professionals and we don't know what is programmed into the software. Second, Mr. Tekell's opinions can only be as good as the information he was provided and, as explained in detail above, they are primarily based on assumptions, not facts, making them speculative.[2]

Further, Mr. Tekell's testimony regarding what Benoit should have seen, that is the "cues" with which she was presented, is likewise speculative, and is based on calculations made using the assumptions and the software, not facts. More importantly, these are matters the jury is perfectly capable of determining for themselves using their common sense and do not require expert testimony.[3]

---

[2] I am not suggesting that testimony based on the Auto-turn software could never be admitted. If it were shown what calculations and assumptions the program is making and that it was indeed merely a time saver and a way to demonstrate what accident reconstruction experts have always done and if it were applied in a case in which there were more facts known, then perhaps the outcome would be different.

[3] Although plaintiff's counsel objected that Mr. Tekell is not a "human factors" expert, Mr. Tekell explained that some human factors analysis is necessarily implicated in accident reconstruction. He also explained that he serves on a task force for a national professional organization dealing with human factors analysis. I accept Mr. Tekell's explanation. Obviously accident reconstruction experts regularly testify, for example, as to a person's expected reaction time. On the other hand, Tekell readily admits that ergonomics, for example, is far out of his field of expertise. Therefore, I do not exclude Mr. Tekell's testimony as to "cues" based on his lack of expertise, but rather based on the fact that there are so many assumptions and so few facts supporting his opinions regarding cues, that it is impossible for any expert to state with any reasonable degree of probability what Ms. Benoit should have seen.

While Mr. Tekell could testify to his opinion that the truck could not have made the turn without encroaching on the right-hand lane (assuming that opinion was not generated by the computer) it does not assist the trier of fact in this case because the truck-driver himself readily admits that fact.

The court was very impressed with Mr. Tekell's qualifications and demeanor and with his candor regarding the fact that he had very few facts with which to work.

Westport's motion, #38.

Westport seeks to exclude the testimony of plaintiff's vocational rehabilitation expert, Glenn Hebert. The basis for the motion is that Hebert's analysis, as reflected in his report, computes plaintiff's lost earning capacity claim to be $25,890 per year based on Hebert's assumption that plaintiff, who had worked as a waitress for the last 20 years, would have become a restaurant manager. He points out that back in 1984-6 she actually did work as a manager for the Hilton hotel.

Defendant argues that plaintiff has not made more than about $8,000 a year since 2002 and has never made anywhere near $25,000. Defendant counters that plaintiff has told the vocational expert that she wanted to be a manager and that she had been promoted to waitress trainer, and then to senior waitress trainer and was "in line" to be promoted to assistant manager. Hebert utilized U. S. Government figures to show that the average wage for a line supervisor (manager) at a restaurant

in the Alexandria area is $25,890. Plaintiff points out that the claim is for earning capacity, not future lost wages at the prior wage rate. Defendant suggests that Hebert has been excluded as an expert witness in other cases for exaggerating wage loss claims; plaintiff suggests that he has likewise been accepted in many other cases.

The Daubert case requires the court to perform a gate-keeping function in order to ensure that the reasoning and methodology used by the expert can properly be applied to the case at hand. Hebert chose to use average weekly wages, one of seven peer reviewed methodologies for calculating lost earning capacity which are generally accepted in his profession, according to the testimony of defendant's expert. Therefore, there is nothing wrong with the methodology Hebert used, even if a different expert might have chosen another of the seven methods.

Further, there is a basis, albeit a tenuous one, for applying the methodology because plaintiff has stated to Hebert, and has filed an affidavit, saying that she was in line to become a manager, despite the fact she had not done so in the last 20 years. Defense counsel will no doubt strenuously and effectively cross examine Hebert at trial as he did at the hearing.

At this time, the only evidence that plaintiff had any interest in becoming a manager is plaintiff's self-serving testimony. Therefore, if it becomes apparent from a deposition of

her manager at IHOP or from testimony at trial, that plaintiff had no realistic chance of ever becoming a manager, the district judge can, on renewed motion, exclude Hebert's testimony on this issue as both speculative and irrelevant. In other words, if it turns out that the weight of the evidence is that plaintiff would never have become a manager, then there will be no basis for applying the methodology–however valid in theory–to this case.

For the foregoing reasons IT IS RECOMMENDED that the motion to exclude the testimony of Mr. Tekell, Doc. #39, be GRANTED. IT IS FURTHER RECOMMENDED that the motion to exclude the testimony of Mr. Hebert, Doc. #38, be DENIED AT THIS TIME, subject always to reconsideration by the district judge, particularly if new evidence comes to light.

**OBJECTIONS**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the clerk of court.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing.  Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS,**

**CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 21st day of August, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE